**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **McClain's Market,** | ) | **CASE NO. 1:04 CV 2042** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **United States of America,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

### Introduction

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 18). This case invokes judicial review of an administrative decision disqualifying plaintiff from the Food Stamp Program. For the following reasons, the motion is GRANTED.

### Facts

Plaintiff, McClain's Market (hereafter, plaintiff or McClain's), brought this Complaint against defendant, United States of America, seeking reinstatement into the Food Stamp Program following an adverse administrative decision.

Pamela Hubbard is the owner of McClain's, located on Central Avenue in Cleveland,

1

Ohio. (Hubbard aff.) In 1997, plaintiff applied for and was granted a food stamp license for the store.

Mary Graf, Program Specialist with the Food and Nutrition Service (FNS), United States Department of Agriculture (USDA), avers the following. In August 2003, the FNS received a referral that plaintiff was paying cash to customers for food stamp benefits, that is, trafficking in food stamp benefits.[1] Graf began a review of the electronic benefit redemption (EBT)[2] data for plaintiff. She used the ALERT program, a computer program utilized by FNS to track questionable EBT redemptions indicative of trafficking in food stamp benefits. Graf concluded that the plaintiff appeared to have suspect food stamp redemptions. The EBT redemptions at McClain's were also reviewed by Carole Miller, another Program Specialist in the FNS Cleveland office. (Mary Graf aff.)

In February 2004, a review of McClain's EBT redemptions was completed for the time period August 1, 2003 through January 31, 2004, and it was determined that there was significant unusual EBT activity at McClain's. Graf examined photographs of the store taken by an independent contractor in August 2003. She and Carole Miller also visited McClain's in February 2004 to determine whether or not the store's inventory and physical layout was capable of supporting the amount and types of sales reflected in the store's EBT data. Graf observed that McClain's is a small, inner-city neighborhood store with only two short very

---

[1] Trafficking of food stamps is defined as the buying or selling of coupons or other benefit instruments for cash or other consideration other than eligible food. *Kahin, infra.*

[2] The food stamp system of physical coupons has been replaced by the Electronic Benefit Transfer (EBT) system which utilizes plastic cards which are "swiped" at the cash register like a credit card. (Doc. 18 at footnote 1).

narrow aisles.  The store had a small check-out area where a few groceries at a time could be placed on the counter.  The store had a hand-held optical scanner which was not present in August 2003, when the photographs of the store were taken.  The store sold a reasonable supply of canned/packaged goods and had an aisle of chips and snack items.  The store had no shopping baskets or carts.  The narrow aisles could not accommodate shopping carts.  The highest priced items in the store were a case of baby formula priced at $95.76 and 13 oz. cans of powdered baby formula priced between $12.99 and $15.99.  The other highest priced items in the store were an 8 oz. can of ground coffee for $4.39 and cold cereals priced between $3.29 and $3.69.  The store sold no fresh or frozen meats, frozen fruits or vegetables, or meats or cheeses by the pound.  A few packages of lower cost meat items, such as bologna, were available in the refrigerated deli case.  (*Id.*)

Graf identified three types of suspicious activity at McClain's detected by the ALERT program: 1) multiple withdrawals totaling excessively large amounts by two or more households within an unusually short time frame, 2) multiple withdrawals totaling excessively large amounts by a single household within an unusually short time frame and 3) excessively large withdrawals by households.  Attachments to Graf's Declaration identify 149 questionable food stamp transactions which occurred at McClain's.  (*Id.* and Attachments A, B and C)

The itemization provides examples of the three categories of suspect activities.

There are 19 charges of multiple withdrawals totaling excessively large amounts by two or more households within an unusually short time frame.  For example, on November 20, 2003, a household made an EBT transaction at 8:10:37 (a.m. or p.m. is not specified) for

3

$22.17. Another EBT transaction by a different household in the amount of $95.76 was made 54 seconds later. 89 seconds later, another EBT transaction by a different household in the amount $71.82 was made. On three other dates, transactions by a household in excess of $50.00 were processed in less than 60 seconds following a prior transaction by a different household. (*Id.,* Attachment A)

There are 75 charges involving multiple withdrawals totaling excessively large amounts by a single household within an unusually short time frame. For instance, on October 24, 2003, one household made five food purchases in the amounts of $79.80, $75.81, $3.70, $7.00 and $71.20 between 6:27 p.m. and 7:28 p.m. Another example occurred on January 10, 2004, wherein one household made three purchases in the amounts of $71.82, $95.76 and $95.76 between 3:23 p.m. and 9:01 p.m. Similarly, on October 6, 2003, one household made two purchases in the amount of $95.76 each within the course of six minutes. And, on September 1, 2003, one household made four transactions between 1:45 p.m. and 3:39 p.m. in the amounts of $3.37, $55.35, $55.35 and $55.35. (*Id.*, Attachment B)

Finally, large withdrawals in single transactions are evidenced. One such redemption was in the amount of $287.28. Forty-three single transactions in the amount of $95.76[3] are noted. Other single transactions in amounts over $75.00 are identified. (*Id.*, Attachment C)

---

[3] As stated above, a case of baby formula priced at $95.76 was available for sale at McClain's. Defendant points out, however, that persons of low-income who receive food stamps and have infants or small children, are also likely eligible for the WIC (Women, Infants and Children) program which benefits can be used to purchase baby formula. As such, persons who receive food stamps and WIC benefits would more likely use their WIC benefits to purchase baby formula. As discussed below, Pamela Hubbard's affidavit does not address or contradict this assertion.

The national average for a food stamp transaction at a convenience store such as McClain's is approximately $6.00 per transaction.  Graf determined that the store did not have the food inventory, price structure, or layout to justify the EBT transactions at the store.  Based on her review of the EBT data, Graf assisted Miller in the preparation of a letter, dated February 26, 2004, which detailed the 149 suspect EBT transactions at McClain's and advised plaintiff that it was being considered for permanent disqualification from the food stamp program based on these unusual EBT redemptions.  (*Id.*)

Plaintiff provided a written and oral response to the February 2004 letter.  The written response stated that McClain's spent $348,744.00 to stock the store between January 2003 and March 2004.  Graf notes that at least 47% of these monies were for alcohol purchases from distributors.  Plaintiff's expense statement showed $117,691.00 for purchases from certain grocery distributors, however, a significant portion of these products would have been for non-food items.  Plaintiff reported non-taxable sales to the State of Ohio in the amount of $384,839.00 in 2003 out of gross sales of $427,530.00, or 90%, although plaintiff's inventory showed that 50% of its inventory was for taxable items.  (*Id.*)

FNS permanently disqualified plaintiff from further participation in the food stamp program in March 2004, after finding plaintiff's evidence and arguments that it was not trafficking in EBT benefits unpersuasive.  An administrative appeal to the FNS Administrative Review Officer followed.  On September 2, 2004, the decision was upheld and plaintiff appealed to this Court.

This matter is now before the Court upon defendant's Motion for Summary Judgment.

**Standard of Review**

5

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53

F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

### **Discussion**

Judicial review over administrative action denying an application to participate in the food stamp program is *de novo* in which the court shall determine the validity of the questioned administrative action. *Warren v. U.S.*, 932 F.2d 582, 586 (6th Cir. 1991) (citing Food Stamp Act of 1964, 7 U.S.C. § 2011 *et seq*. §Section 2023(a) ) "A district court is to make its own findings based upon the preponderance of the evidence and not limit itself to matters considered in the administrative proceeding." *Id.* (citing *Saunders v. United States*, 507 F.2d 33, 36 (6th Cir.1974)). The burden of proof herein is on plaintiff to establish the invalidity of the administrative action by a preponderance of the evidence. *Id.* The court must determine whether defendant acted within its authority in permanently disqualifying plaintiff from the food stamp program. *Bakal Bros., Inc. v. U.S.*, 105 F.3d 1085, 1088 (6th Cir. 1997) (citing *Goldstein v. United States*, 9 F.3d 521, 523 (6th Cir.1993) ).

*Kahin v. United States*, 101 F.Supp.2d 1299 (S.D.Cal. 2000), is similar to the case

herein. *Kahin* involved permanent disqualification from the food stamp program based on evidence of irregular and inexplicable patterns in EBT data. In *Kahin,* the FNS identified EBT transactions occurring at plaintiff's grocery store revealing "(1) rapid, repetitive electronic debits in unreasonable time periods, (2) excessively high numbers of EBT debits of round dollar amounts, (3) a high number of balance depletion transactions, and (4) electronic card debits in large dollar amounts." *Id.* at 1300. Additionally, the charge letter noted, *inter alia,* that the FNS had verified that the store "had no shopping carts, one cash register and limited stock which could not sustain the type of transactions recorded in the EBT data." *Id.* During administrative proceedings, plaintiff argued that the suspect EBT data was a result of "somewhat unusual purchasing patterns" of its Somali customers. Plaintiff alleged that the rapid, repetitive transactions were a consequence of Somali customers phoning-in their orders to the store at the beginning of the month so that several families arrived at the store together to pick up their pre-packaged groceries due to the need to car pool. Plaintiff also alleged that the "Somali families are unusually large, purchase food products in bulk, and purchase their entire monthly food supply at the beginning of the month when the food stamps are first available; thereby explaining the large transactions and balance depletions." Plaintiff further argued that the store had a larger storage area than the FNS investigators had noticed which would accommodate more inventory. The FNS was not persuaded by these arguments. Nor did the court find them sufficient upon judicial review. The court recognized that the statute required "permanent disqualification on the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store." *Id.* at 1303 (citing 7 U.S.C. § 2021(b)(3)(B) ). Thus, the court

stated that in order to avoid summary judgment, plaintiff had to raise material issues of fact as to each of the violations charged against it.  Plaintiff did not offer new evidence and argued that "the FNS's failure to produce evidence indicating that [the] store was caught 'red-handed' engaging in food stamp or EBT card fraud precludes summary judgment."  The court rejected this assertion and determined, "While the Court agrees that Plaintiff's explanations about the spending patterns of his Somali customers may tend to negate some of the inferences from the EBT data and raise some material issues of fact, they do not sufficiently account for all the suspicious activity." *Id.*

The plaintiff herein fails to present even so much as an explanation offered by the plaintiff in *Kahin.*  Pamela Hubbard avers the following.  She has observed the increased traffic of customers into McClain's attributable to its participation in the WIC Program, beginning in February 2003.  McClain's was the beneficiary of a number of stores closing in the Central area of Cleveland in 2003 and 2004.  The layout of McClain's is not indicative of the significant increase of customers and the multiple number of daily trips made to neighborhood wholesale retailers to accommodate the increased demand of various products.  The increased number of customers necessitated an additional checkout lane and a proposed plan to further expand the store.  McClain's has paid local vendors $348,743.64.  (Hubbard aff.)  The affidavit is not supported by other evidence.

Hubbard's affidavit presents no explanation of any of the 149 transactions asserted against plaintiff, but merely presents general justifications for large expenditures.   Any one of the 149 transactions is sufficient to establish a violation.  Hubbard avers now, as she did during the administrative proceedings, that McClain's spent  $348,743.64 to stock the store,

9

presumably during the period in question.  However, Graf avers that at least 47% of these monies were for alcohol purchases from distributors.  Food stamps may not be used to purchase alcohol.  Plaintiff does not dispute Graf's averment.  Plaintiff fails to meet its burden because it has not explained the transactions or raised a material issue of fact with respect to any of them.

Plaintiff herein asserts that "the spending habits of [its customers] is something the Government can only assume, unless or until a customer admits that McClain's Market had engaged in Food Stamp Trafficking.  And, of course, the Government cannot prove that charge."  (Doc. 23 at 6).  However, like in *Kahim,* where the plaintiff asserted there was no evidence that the store was caught "red-handed," such an assertion is insufficient to survive summary judgment.

### Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.

    /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 11/3/05

10